MERCEDES RODRÍGUEZ FIGUEROA, Appellant, *v.* THE REGISTRAR OF PROPERTY OF GUAYAMA, Respondent.

No. 1297. Submitted July 9, 1953.—Decided December 30, 1953.

*Victor M. Pons* for appellant. The respondent Registrar appeared by brief.

MR. JUSTICE ORTIZ delivered the opinion of the Court.

On December 8, 1952 the Registrar of Property of Guayama denied recordation of an Order of the Superior Court, Caguas Part, dated October 7, 1952, which establishes petitioner's title over part of a rural property located at Quebradillas Ward in Barranquitas, within the former judicial district of Guayama. The note of refusal was based on the Registrar's theory that the property is located "in a territorial district other than the one where the proceeding was filed, that is, the Superior Court of Puerto Rico, Caguas Part, which has no competency in this proceeding." Mercedes Rodríguez Figueroa, petitioner in the dominion title proceeding, in whose favor the afore-mentioned order was rendered, has filed an Administrative Appeal in this Court, praying for the reversal of the afore-mentioned note of refusal.

The respondent Registrar invokes § 395 of our Mortgage Law which provides that a dominion title proceeding shall be submitted to the "Judge of the court of first instance of the judicial district in which the property is situated." Petitioner alleges that under the new judicial system prevailing in Puerto Rico, by virtue of the provisions of the Constitution of the Commonwealth of Puerto Rico and of the Judiciary Act of July 24, 1952 (Spec. Sess. Laws, p. 30), there is a single unified Court of First Instance, with a single jurisdiction, and that the Commonwealth of Puerto Rico is constituted as a single judicial district thereby eliminating all jurisdictional differences between the various divisions of that single court, and, therefore, that each and everyone of those divisions is competent to hear and determine a dominion title proceeding, independently of the place in Puerto Rico where the property lies. As to § 395 of the Mortgage Law, petitioner alleges that Puerto Rico is now a single "judicial district."

This administrative appeal raises fundamental questions as to the effects of the new Judiciary Act. Let us

point out at the outset of the discussion that the new judicial system maintains the former categories as to venue, according to procedural convenience and to the convenience of the parties and of the witnesses. The Judiciary Act in §§ 13 and 18 establishes the general objectives and directives as to what types of cases are cognizable in the most appropriate and convenient division or part of the court. It is true that under our Constitution and under our Judiciary Act a unified judicial system is established. The former jurisdictional differences in the various courts or divisions or parts of the court are eliminated, and the technical problems of jurisdiction and the inexorably fatal consequences of lack of jurisdiction are destroyed. Any case may be filed, adjudicated and heard in any division or part of the Court of First Instance and no judgment rendered by the division or part of the court where the case was heard, shall be void, even if that division or part is not the most convenient, if the parties have agreed, with the consent of the judge, that the case be heard in that division or part of the court, assuming the judgment entered is valid. But the fact that the judgment is not void does not imply that the judges in general, as a practical matter, should shirk their responsibility of assuring that cases be heard in the most convenient and appropriate division, pursuant to the general standards contained in §§ 13 and 18 of the Judiciary Act. This great responsibility may be fulfilled by the use of the power to transfer the cases to the division or part which is most convenient or appropriate or by the effective exercise of the judicial power in not approving agreements of submission which are contrary to procedural efficiency and to the actual convenience of the parties and of the witnesses. Naturally, in determining the convenience of the parties, their agreement of submission, whether express or implied, must be preeminently reckoned with by the judge in exercising his discretion, unless the agreement is openly contrary to procedural convenience.

674·

■■ After this introduction, we pass to consider the merits of the case. But first we must define the concepts. The term "jurisdiction" means the power or authority of a court to hear and determine the cause or controversy.[1] 14 Am. Jur. 363; 21 C.J.S. 28; *United States* v. *Arredondo*, 6 Pet. 691, 708; *Daniels* v. *Tearney*, 102 U. S. 415; *Petty & Co.* v. *Dock Contractors Co.*, 283 F. 338; and see *Words and Phrases*, Vol. 23, p. 358 *et seq.*, permanent edition and Supplement of 1953, p. 140 *et seq.* On the other hand, the concept of place of trial or venue refers to the place or specific locality where such power should be exercised, that is, the place of trial, from the point of view of the convenience of the parties and of the witnesses, the concept being one of a geographical or territorial distribution of the exercise of the power of adjudication. *Neirbo Co.* v. *Bethlehem Corp.*, 308 U. S. 165; 21 C.J.S. 33; 67 C. J. 11, 12; *Southern Sand & Gravel Co.* v. *Massaponax S. & G. Corp.*, 133 S. E. 812; *Words and Phrases*, Vol. 23, p. 401, permanent edition and Supplement of 1953, p. 153.

In *Arganbright* v. *Good*, 116 P. 2d 186, 46 Cal. App. 2d 877, citing from *Paige* v. *Sinclair*, 130 N. E. 177, 178; 237 Mass. 482, the following is stated:

"...Jurisdiction is a term of comprehensive import. It concerns and defines the power of judicatories and courts. It embraces every kind of judicial action touching the subject of the action, suit, petition, complaint, indictment or other proceeding. It includes power to inquire into facts, to apply the law, to make decision and to declare judgment. ... Venue in its modern and municipal sense relates to and defines the particular county or territorial area within the state or district in which the cause of prosecution must be brought or tried. It commonly has to do with geographical subdivisions, relates to practice or procedure, may be waived, and does not refer to jurisdiction at all."

---

[1] It is the power to "speak" the law, that is, "juris-dico" or "juris-dicto" or "jus-dicere." *Long Flame Coal Co.* v. *State*, 163 S. E. 16, 19; *Atwood* v. *Cox*, 55 P. 2d 377, 380; *Barrs* v. *State*, 97 S. E. 86; *Johnston* v. *Hunter*, 40 S. E. 448; *In re Woodside-Florence Irr. Dist.*, 194 P.2d 241, 244.

In brief, the difference between jurisdiction and venue is coordinated with the difference between the power of a Court and the convenience of the litigants, the courts and the witnesses, (*Neirbo Co.* v. *Bethlehem Corp., supra*, at p. 168), such convenience being achieved by the selection of the most appropriate Court, subject to the will of the parties, respecting the rules of venue. On the one hand, we have a technical concept of the judicial power and, on the other hand, the realistic postulate of procedural convenience for the purpose of insuring an efficient administration of justice. 20 Minn. L. Rev. 617, 648. From the point of view. of its historical origin in England (48 Mich. L. Rev. 1) as well as from the point of view of its development in the United States, the concepts of venue have been exclusively based on the convenience of the courts, of the parties and of the witnesses. 49 Mich. L. Rev. 307: "Venue Statutes: Diagnosis and Proposed Cures"; 43 Harv. L. Rev. 1217: "Place of Trial in Civil Actions"; 25 Tulane L. Rev. 399.

From the afore-mentioned definitions the following consequences arise in those jurisdictions where the distinction pointed out prevails:

(1) The absence of jurisdiction involves a radical defect which implies the absolute nullity of a judgment, which is not cured by the submission of the parties. On the other hand, the lack of venue does not entail the nullity of the verdict, if the interested party or the litigants have expressly or implicitly submitted.

(2) The jurisdictional power is essential for the validity of the proceedings, and may not be waived by the parties. The rules as to the place of trial constitute a personal privilege of the interested parties, which they may waive, either expressly or by implied submission, upon appearing at a court of improper venue or by failure to assert it seasonably. *Neirbo Co.* v. *Bethlehem Corp., supra*, at p. 168.

THE REFORM IN PUERTO RICO

■ To carry out the above-mentioned postulates, in order to eliminate technical obstacles to the achievement of substantial justice and to achieve a more efficient system of court administration, a notable judicial reform has taken place in our Island. The movement of renovation began with Act No. 432 of May 15, 1950 (Sess. Laws, p. 1126). Although it maintained a distinction of respective powers, it still created a single District Court and a single Municipal Court, with different divisions and parts of courts. Section 3 of that Act provided:

"Section 3.—*Judicial District.*—The territory of Puerto Rico is hereby constituted into a judicial district.

"The courts of justice shall exercise their jurisdiction over all of the territory included in said judicial district."

Construing the former Section the following was held in *Figueroa* v. *District Court*, 72 P.R.R. 23, 27, 28:

"... By virtue of the aforesaid Sections it is evident that the judge of the Municipal Court of Puerto Rico, Toa Alta Section, was authorized to issue a search warrant enforceable in Bayamón. This is so because as we have seen, at present and by virtue of Act No. 432, *supra,* there is only one judicial district in the whole island of Puerto Rico; because the courts of justice ... shall exercise their jurisdiction over all of the territory included within said judicial district; ..."

Applying the same provision, it was held in *Martínez* v. *Morales*, 72 P.R.R. 200, that a service of summons anywhere in Puerto Rico was made, under Act No. 432, within the only judicial district existing in Puerto Rico, and that defendant had only 10 days after the service of summons to plead, holding further that Rule 12 (*a*) and § 89 (3) of the Code of Civil Procedure were rendered superfluous by Act No. 432 which created a single judicial district, insofar they provided for service within 20 days outside the district where the action was brought, but within Puerto Rico.

The new Constitution of the Commonwealth of Puerto Rico expressly eliminated the concept of jurisdiction which prevailed formerly, thereby eliminating from our fundamental law the former jurisdictional differences. Section 2 of Article V, concerning the judicial power, provides as follows:

"Section 2.—The courts of Puerto Rico shall constitute a unified judicial system for purpose of jurisdiction, operation and administration. The Legislative Assembly may create and abolish courts, except for the Supreme Court, in a manner not inconsistent with this Constitution, and shall determine the venue and organization of the courts." [2]

Referring to this Section, the report of the Judiciary Committee of the Constitutional Convention of Puerto Rico defines, in a clear and manifest way, the elimination of the rules of jurisdiction, stating in part, the following:

"This Section establishes the complete unification of the courts of Puerto Rico. *Unification of the courts, among other things, results in the elimination of technical problems of jurisdiction.* However, the legislative power may still determine the venue of the courts and may provide that if a litigant files suit in a court other than that provided by the venue statutes, the opposing party may request and obtain removal of the cause, or the court on its own initiative may so direct. The Legislative Assembly is also empowered to provide for judicial review of orders of removal.

"The Committee recommends adoption of this integrated system in order to assure attainment of the following objectives:

"1.—The greatest possible efficiency in the exercise of the Judicial Power.

"2.—An equitable distribution of the work of the courts which will permit prompt disposition of judicial proceedings and thereby avoid crowded court dockets.

"3.—Emphasis on the principle of specialization of judges rather than specialization of courts, thereby avoiding the necessity of additional courts or divisions and creation of an excessive number of judicial posts.

---

[2] In its English text, § 2 of our Constitution identifies *"competencia"* with venue.

"4.—Reduction of the cost per case to the public treasury.

"5.—The greatest possible flexibility in the administration of justice.

"*This integrated judicial system which we recommend will eliminate litigation of the technical questions of jurisdiction.* Under the prevailing system in Puerto Rico the ends of justice have frequently been defeated and rights of litigants have been irremediably prejudiced because they have sued in courts which under the said system lacked jurisdiction, for highly technical reasons, to decide such cases. Frequently, the technical error is discovered after a lapse of time and after the litigant has incurred expenses. *The establishment of this unified judicial system which is recommended will completely eliminate all these deficiencies. On the other hand, the power is reserved for the Legislative Branch to establish by law the venue of the courts, including the place where cases should be tried. An error of venue will always be curable at the petition of the parties or by order of court without fatal prejudice to the rights of the litigants.*

"There is also reserved for the Legislative Branch the power to create new courts or to abolish existing courts with the exception of the Supreme Court.

"*Sources:* The Committee utilized as direct sources for this section Article 6 of the New Jersey Constitution and the Judicature Act of England of 1873 and 1875. It also examined and adopted recommendations contained in the following works: Pound, R.; *Organization of Courts* 1940; Willoughby, W. F.: *Principles of Judicial Administration,* 1929; Pirsig, N. E.: *Cases and Materials on Judicial Administration,* 1946; Patterson, C. P.: *Administration of Justice in Great Britain,* 1936; Jackson, R. M.: *The Machinery of Justice in England,* 1940; McCormick: *A Proposed Organization of the Illinois Judiciary,* 29 Ill. Law Rev. 31 (1934); McCormick: *Modernizing the Texas Judicial System,* 21 Texas Law Rev. 673 (1943). The Committee also examined articles in the Journal of the American Judicature Society. In addition this Section follows the specific recommendation of the American Bar Association on unification of courts. To that effect see: Vanderbilt, A. T.: *Minimum Standard of Judicial Administration,* 1949, p. 29.

"Some elements of the integrated system exist in states other than New Jersey, especially in California, Connecticut, Maryland and Missouri. The judicial system of Puerto Rico itself prior to 1898 contained some of the fundamental characteristics of the unified system of courts. We also note that in 1950 the Legislative Assembly of Puerto Rico established unification at their different levels of the district courts, including the Tax Court and the Court of Eminent Domain, as well as the municipal courts and the justices of the peace." (Italics ours.)

On the floor of the Constitutional Convention the President of the Judiciary Committee, Lic. Ernesto Ramos Antonini, in explaining the aims of the proposition submitted by that Committee, stated in part the following:

"The independence of the judiciary is guaranteed, in our opinion, according to the proposition, by including in the project about 10 characteristics.

"Integration, which has already been mentioned, is one of them. At present, the system of the courts, as it is now, and especially concerning the Municipal Courts and to a certain extent, the District Courts, functions, to a considerable degree, as cells; but rather than as cells, as separate and independent organs. It is not a single organization. We consider that under the present system the courts are liable to function in a more disintegrated manner from the central judicial power, which should give the tonic of the function of the judicial power in our society." (*Diario de Sesiones* of the Constitutional Convention, p. 172.)

In the work: *Notes and Comments on the Constitution of the Commonwealth of Puerto Rico*, it is stated, at p. 87, the following, commenting § 2 of Article 5:

"The underlying objectives of this section are (1) prompt disposition of cases and (2) decisions on the merits, and not on technicalities of jurisdiction. Their achievement is made possible by the provision that the courts shall constitute a unified judicial system.

"The most important feature of this provision is unification of the courts for purposes of jurisdiction. At present, the hierarchy of courts in Puerto Rico, below the Supreme Court

(justice of the peace, municipal, and districts courts), is not clear-cut: each court has jurisdiction over the cases provided by law, with the result that the problem of which court has jurisdiction in a given case is often technical and complicated.

"Section 2 eliminates vexatious questions of jurisdiction by unifying the court system.

"Integration of the courts in some States has been effected by creating one general court, with trial and appellate divisions. Although Section 2 does not use that technique, the practical results should be equivalent."

The Judiciary Act (Act No. 11 of July 24, 1952), was approved for the purpose of fulfilling the constitutional mandate. It provides, in part, the following:

"Section 1.—*Judicial Power of the Commonwealth of Puerto Rico.*

"The judicial power of the Commonwealth of Puerto Rico shall be vested in a single unified judicial system for purposes of jurisdiction, operation and administration, consisting of the Supreme Court as the court of last resort, and the Court of First Instance, which together shall constitute the General Court of Justice.

"The Commonwealth of Puerto Rico is hereby constituted a single judicial district, over all of which the General Court of Justice shall exercise its power and authority.

" .
" .

"Section 9.—*Organization of the Court.*

"The Court of First Instance shall consist of two divisions, a division to be known as the Superior Court and a division to be known as the District Court. Each division shall be a court of record and shall be constituted as, and shall perform the functions, hereinafter set out.

"Section 10.—*Jurisdiction and Venue preserved.*

"The Court of First Instance is a court of original general jurisdiction with power to act in the name and by the authority of the Commonwealth of Puerto Rico in all civil and criminal proceedings as hereinafter provided. Every civil or criminal action shall be filed in the part of the court held at the place where it should have been filed under the legislation heretofore in force; but no cause shall fail on the ground that it has been

submitted to a division without jurisdiction or authority or to a part of the court of improper venue. Every case may be heard in the division or part where it is brought by agreement of the parties and consent of the judge presiding at the time in such part or, if not so heard, shall be transferred by order of the judge to the appropriate division or part in accordance with such rules as may be adopted by the Supreme Court.

" . . . . . . . . .

"Section 13.—*Scope of Power*.

"The Superior Court shall have cognizance of the following matters:

"(*a*) Civil:

" . . . . . . . . .

"4. Of all recourses, actions and proceedings, including the probation of wills, divorce and extraordinary and special legal remedies, in regard to which the District Court of Puerto Rico heretofore exercised cognizance up to the date on which this Act takes effect.

"5. Of all other civil matters where the amount, legal interest or property sought exceeds in value the amount of two thousand five hundred (2,500) dollars, not including interest, costs and attorney's fees. . .

"Section 18.—*Scope of Powers*.

"The District Court shall have cognizance of the following matters:

"(*a*) Civil:

"1. Of all matters of which the Municipal Court existing at the time this Act takes effect took cognizance, exclusively or concurrently.

"2. Of all other civil matters where the amount, legal interest or property sought does not exceed in value twenty-five hundred (2,500) dollars not including interest, costs and attorney's fees, except for those matters stated in Section 13 (*a*) 2, 3 and 4 herein of which cognizance is given to the Superior Court.

"(*b*) Criminal:

"1. Of all misdemeanors, except those which were not heretofore cognizable by the Municipal Court.

"2. Of all violations of statutes or of municipal ordinances whose enforcement has heretofore been vested exclusively or concurrently in the Municipal Court, or in the Justice of the Peace Court." ·

As may be seen, the Judiciary Act establishes the following postulates, in part:

(1) That the writs, actions and proceedings which were formerly heard in the former District Court or in the former Municipal Court should continue being heard, as a judicially sound general rule, in the same section of the Court of First Instance where they were formerly heard, although the violation of this rule should not produce fatal effects of annulment of the judgment rendered, the concept of invalidity of the judgment for lack of jurisdiction having been eliminated.

(2) Subject to the general rule of practical preference pointed out above, any case, action or proceeding may be filed in any division or part of the Court of First Instance, and no cause shall fail if the parties agree and the Judge presiding at the time consents.

(3) A single General Court of Justice and a single Court of First Instance are established, exercising their power and authority over the Commonwealth of Puerto Rico which becomes a single judicial district, that is, a single judicial jurisdiction is established.

(4) By the establishment of a single Court of First Instance in a single judicial district, any possible *jurisdictional* differences among the various divisions and parts of the courts that integrate that Court have been eliminated. Clark and Rogers; *"The New Judiciary Act of Puerto Rico,"* 61 Yale L.J. 1147, 1155 *et seq.*

(5) No judgment or decision is automatically void because it has been rendered without jurisdiction and "no cause shall fail on the ground that it has been submitted to a division without jurisdiction or authority or to a part of the court of improper venue."

(6) The judicial power is supplemented by the express or implied submission of the parties, and the former rule to the effect that jurisdictional defect is not cured by the submission of the parties is eliminated. Under the new act

the objection as to the absence of judicial power constitutes a personal privilege that may be waived by the litigants.[3]

Another fundamental consequence of the judicial reform established by our Constitution and by the Judiciary Act consists of the fact that the former concepts of jurisdiction by reason of amount and subject matter have been separated from that jurisdictional range and placed in the new category of venue or competency. In other words the concept of venue has been enlarged to include, within its definition, as well as within its juridical frontiers and its legal consequences, the postulates concerning the power or faculty of the courts by reason of amount or subject matter. What was formerly jurisdictional now becomes a matter of venue or competency. For example, any case may be heard in any division or part of the Court of First Instance, and the judgment rendered therein is valid independently of the amount involved or of the subject matter in issue, if both parties have agreed in submitting, expressly or implicitly, to the competency of that division or part of the court, as long as the judge presiding at the time has consented.

### DOMINION TITLE PROCEEDING

After the previous general discussion concerning the constitutional and legislative collapse of the concept of jurisdiction in Puerto Rico, as that concept was formerly understood, we shall now turn to discuss the effect of the

---

[3] The former six postulates arise also from the discussion of our judicial reform appearing in the following works: Hon. A. Cecil Snyder, Chief Justice of the Supreme Court of Puerto Rico: *"New Puerto Rico Judicial System is Modern and Efficient,"* Journal of American Judicature, Vol. 36, number 5, February 1953, p. 134; Chief Justice Snyder: *"Puerto Rico Modernizes Courts,"* National Municipal Review, Vol. 42, No. 1, January 1953, p. 11; oral report of Judge Clark at the public hearing on the Judiciary Act, held July 21, 1952 before the Entire Committees of the Juridical Civil, of the Senate and of the House of Representatives of Puerto Rico; Oral report on that same occasion of Víctor Gutiérrez Franqui, then Attorney General; Víctor Gutiérrez Franqui and Henry Wells: *The Commonwealth Constitution,* Annals of the American Academy of Political and Social Science, January 1953, pp. 33, 40.

juridical renovation in the specific circumstances of this case. Article 395 of our Mortgage Law provides, in part, that a dominion title proceeding shall be filed by submitting a statement to "the judge of the court of first instance of the judicial district in which the property is situated." In *Nazario* v. *Registrar of Property*, 16 P.R.R. 635, it is held that, under § 395, the jurisdiction conferred by the law upon the "judge of the district" within which the property is situated, is *exclusive*, and the submission of the appellant in a dominion title proceeding is not sufficient to confer jurisdiction upon another "District Court," since there would be a jurisdictional defect that would render void a declaration of ownership made by a "District Court" other than the one of the district where the property lies, and this radical defect is not cured by resorting and submitting to the jurisdiction of another court. This Court points out in the *Nazario* case that it is not a question of contested actions where the parties may submit, but that a dominion title proceeding involves an *ex-parte* proceeding of a single interested party, and that the unilateral will of that interested party should not impair the principle of exclusive jurisdiction embodied in § 395. This Court further states that "it is in the district where the property is situated and where it is natural that the parties who may have opposing interests to those of the petitioner reside, that proceedings of this character should be had, in the open, with the greatest publicity possible under the law."

Some of the Spanish commentators on the Mortgage Law agree, independently, with the ruling laid down in the *Nazario* case, to the effect that the absence of "exclusive jurisdiction" in a dominion title proceeding can not be cured by the submission of the petitioner, since it is an essential defect of jurisdiction which absolutely voids the proceeding. Morell, *Legislación Hipotecaria*, Vol. 5, pp. 454, 532: "In *ex-parte* proceedings... to admit competency by reason of an express submission is equivalent to eliminating the rules of

competency marked for each case in the law, substituting for them the exclusive will of the interested party." See also, Roca Sastre, *Derecho Hipotecario*, Vol. 2, p. 489: "There is no place for submission of any kind, for the competency of the court shall be exclusively determined by the location of the property."

We see fit to make certain observations with regard to the doctrine laid down in the case of *Nazario* v. *Registrar*, *supra*, and made clear by the aforesaid commentators. Undoubtedly, § 395 states that the dominion title proceeding should be heard in the District Court of the judicial district where the property lies. But the problem is whether the power of that court was so exclusive that it became an inexorable jurisdictional requirement not curable by the submission of the interested party. From that point of view, it is relevant to state that the opinion of the aforesaid commentators was notably affected by the fact that the former § 505 of the Regulations for Execution of Mortgage Law of Spain [4] stated that the competency of the courts to entertain dominion title proceedings "shall be *exclusively* determined by the district in which the property sued on is situated." (Italics ours.) When the Regulations for the Execution of the Mortgage Law were approved in Puerto Rico, § 505 was not incorporated into our Regulations, nor did the Law or the Regulations state that such competency was exclusive. Article 395 grants competence to the Court of First Instance of the judicial district in which the property is situated. We have already seen that, under the new Constitution, the Judiciary Act establishes a single Court of First Instance, with original general jurisdiction, in a single judicial district,

---

[4] In 1946 Spain approved a new Mortgage Law and a new Regulation. Article 201 of the new Act provides that the judge of the Court of First Instance of the judicial district in which the property is situated, shall be a competent judge in a dominion title proceeding. Article 273 of the new Regulation provides that competency shall be exclusively determined by the district in which the property is situated. Medina y Marañón, *Leyes Civiles de España, Ley y Reglamento Hipotecario*, pp. 118 and 226.

that is, there is a single "judicial district" which includes the whole of Puerto Rico and if the property is situated in that single "judicial district" of Puerto Rico, any division of the Court of First Instance may take cognizance of a dominion title proceeding, in harmony with § 395 of the Mortgage Law.[5]

As we have seen, the Judiciary Act states that a cause shall not fail on the ground that it has been submitted to a division without jurisdiction or authority or to a part of the court of improper venue. As to dominion title proceedings, it means that the power of a particular part of a court is not exclusive, and that a dominion title order is not void, even if heard at any division, providing further, that every case may be heard in the division or part where it is brought, by agreement of the parties and consent of the presiding judge. All this renders ineffective the doctrine laid down in *Nazario* v. *Registrar, supra.* The Judiciary Act admits the submission of the applicant, which renders the decision valid even if rendered without jurisdiction or competency. Since the Judiciary Act is applicable to dominion title proceedings, no division of the Court of First Instance has exclusive jurisdiction over such proceedings, and when petitioner resorts to any division, it implies a submission which renders the decision valid.

It could be alleged that the Judiciary Act is not applicable to *ex-parte* proceedings. A dominion title proceeding is *ex parte (Benítez* v. *Registrar,* 71 P.R.R. 526, 531, 532),

---

[5] The respondent Registrar alleges that under § 413 of the Mortgage Law none of the articles of which the law consists can be repealed except by virtue of another special law, and that, therefore, § 395 should not be considered as repealed by the Judiciary Act. But we are not determining whether such repeal has taken place. Article 395 speaks of the judge of the judicial district where the property is situated. Other laws define the scope and boundaries of a "judicial district," that is, the territory subject to the jurisdiction of a court. (*Enciclopedia Jurídica Española,* Vol. 24, p. 422.) Under the Judiciary Act the "judicial district" is a single judicial district which includes the whole territory of Puerto Rico. The Act does not repeal, but defines, the contours of § 395.

provided there is no conflict between known and particular parties. *Cf. Rivera* v. *District Court*, 68 P.R.R. 625. But there is nothing in the aforesaid Act which excludes *ex-parte* proceedings from its application. Contrariwise, the afore-mentioned § 10 is applicable expressly to every proceeding and to every civil or criminal action. The provisions as to a unified judicial system insofar as it concerns jurisdiction and the existence of a single Court of First Instance, with original general jurisdiction over a single judicial district, are of general application and the *ex-parte* proceedings are not excluded from that unified judicial system. It is true that § 10 provides, in part, that every case may be heard in the division or part where it is brought, *"by agreement of the parties* and consent of the judge presiding at the time in such part," (italics ours) and that in an *ex-parte* proceeding there can be no adverse parties who might reach a bilateral agreement.

Deciding the last problem raised in a realistic manner, in a dominion title proceeding the former owners, the prosecuting attorney, the adjoining owners, and those who might have any legal right, must be summoned. Morell, *op. cit.*, Vol. 5, pp. 530, 531, 536; Roca Sastre, *op. cit.*, Vol. 2, pp. 493, 494; *cf. Maldonado* v. *Registrar*, 53 P.R.R. 884; *Pozzi* v. *Registrar*, 40 P.R.R. 820; *Rivero et al.* v. *Hernández et al., supra; Colón et al.* v. *Registrar*, 23 P.R.R. 701; *Calderón et al.* v. *García*, 14 P.R.R. 407. Although technically speaking the former owners, the interested parties, and the prosecuting attorney are not parties, in the classical sense of the word, still, they would always have the opportunity, upon appearing, of requesting the transfer to the most appropriate division. If they do not appear, or if they do appear but do not request such transfer, it should be understood that the "agreement" to which § 10 of the Judiciary Act refers has been reached, such agreement being either express or implied. In that way, the rights of all the interested parties in the proceeding are safeguarded. Be-

sides, § 10 further provides that "if not so heard [it] shall be transferred by order of the judge to the appropriate division or part in accordance with such rules as may be adopted by the Supreme Court." The power of change of venue which the judge has *"motu proprio"* is applicable to *ex-parte* proceedings and the very existence of such power implies that the question is not one of fatal and inexorable jurisdiction, which imports, even if said power is not exercised, the absolute invalidity of the decision.

From a realistic and functional point of view, it is more convenient for dominion title proceedings to be heard in the division which is nearest to the place where the property is situated, in order that the adjoining owners and other interested parties, generally neighbors of that place, may have a more adequate opportunity to appear and enforce their rights. But then it is the case of a rule of convenience, that is, of venue and not of jurisdiction, the absence of which might be implacably fatal. The situation being placed in a category of procedural convenience, and not of jurisdictional metaphysics, the judge presiding over the division which is farthest and where the petition has been brought, would always have the power to exercise his discretion, for the sake of justice and of the potential rights of the interested parties, and transfer *motu proprio* the proceeding to the nearest division, and that would be the advisable practice. But his failure to do so, although it might result in practical inconvenience, would not operate as a technical invalidity. Furthermore, if the record owner of a contradictory entry appears and objects to the petitioner's claims, the dominion title proceeding becomes a contested and plenary action before the contradictory entry may be cancelled. *Bermúdez* v. *Registrar*, 74 P.R.R. 141; *Benítez* v. *Registrar*, *supra; Bravo* v. *Registrar*, 71 P.R.R. 862; *Mercado* v. *Registrar*, 68 P.R.R. 129; *Rodríguez* v. *Registrar*, 65 P.R.R. 614. The beneficiary of a recorded contradictory title could always request the corresponding transfer and in any event, the proceeding would then be contested and not *ex parte*.

■ Even if the transfer is not requested, while the proceeding may be *ex parte*, the mere fact that the decision has been rendered by an inconvenient division has no trait of a judicial tragedy, nor does it destroy definitively the rights of interested parties. A dominion title is not a definitive declaration of rights and, therefore, it does not preclude a subsequent declaratory judgment at the request of interested parties. Morell, *op. cit.*, p. 529. A dominion title proceeding has the exclusive effect of vesting title, either possessory or of dominion on the person without title, that is, of proving the existence of a dominion title, without therefore being equivalent to a declaration of rights. Judgment of the Supreme Court of Spain of March 21, 1910; Decision of the General Directorate of Registries of November 16, 1923; Roca Sastre, *op. cit.*, Vol. 2, p. 485 *et seq.*, p. 488. The dominion title order is not *res judicata* and does not preclude a subsequent attack by the parties who have not sued. *Benítez* v. *Registrar, supra*, p. 531; *González* v. *People*, 10 P.R.R. 458; Barrachina, *Derecho Hipotecario y Notarial*, Vol. 4, p. 322. The record of a dominion title order in favor of a person does not preclude another person from bringing an action of revendication. *Heirs of Meléndez* v. *Almodóvar*, 70 P.R.R. 500. So that even if the case has been *ex parte* in an inappropriate division, the essential rights of the interested parties who have not appeared have not been impaired, and interested parties still have the remedy of the subsequent plenary action as to their substantive rights.

■ The importance of this case justifies a more elaborate consideration of some of its points. Section 10 of the Judiciary Act contains, in part, the following provisions:

(1) The Court of First Instance *is a court* with power to act *in all proceedings*.

(2) Every civil or criminal action shall be filed in the part of the court situated at the place where it should have been filed under the legislation in force until the approval of this Act. Apparently this is a mandatory provision, but it

is immediately characterized in § 10 itself by the following provisions:

(3) No cause shall fail on the ground that it has been submitted to a division without jurisdiction or authority or to a part of the court of improper venue.

(4) Every case *may be* heard in the division or part where it is brought, *by agreement of the parties*, and consent of the judge.

We must remember that this case involves the action of a Registrar in refusing to record a judicial decision. The Registrar bases his action on the fact that the dominion title proceeding was not brought in the district where the property lies, pursuant to the provision of § 395 of the Mortgage Law. But we have already seen that one of the effects of the judicial reform has been the creation of a single district, that of Puerto Rico. Therefore, the dominion title proceeding was brought in the district where the property lies, and hence, the ground for the Registrar's action collapses. But assuming the Registrar's power to refuse to record a judicial order because the legal prerequisites to enter the order have not been complied with, or that the essential proceedings and rules for its validity have not been observed, (*Nido & Cía., S. en C.* v. *Registrar*, 74 P.R.R. 737, footnote (2) and cases therein cited), we would have to determine whether the essential requirements established in § 10 of the Judiciary Act have been fulfilled.

It is true that the latter Section provides that every action shall be brought in the division where the action would have been brought under the former legislation in force. Under the legislation in force prior to the judicial reform, the dominion title proceeding in this case would have been brought in the present Guayama Section. But § 10 further provides that *every case* may be heard in a division other than the one stated by the former laws in force, by agreement of the parties and consent of the judge. We must first determine whether there was an "agreement by the parties." It is

necessary to define the concept of "agreement." The term may have several meanings, and our selection of one of them must be based on a reasonable criterion as to what was the legislative intent in using that concept. To appreciate the legislative intent it is necessary to thoroughly look into the aim of the legislature in approving the Judiciary Act as a whole, within the scope of our Constitution, which was implemented by the Act in question, and in the light of the former legislative history concerning the rules of venue.

The term "agreement" in its general meaning might be identified as an express and written contract between two or more persons, which gives rise to an obligation. That could be its scope in positive law, under the provisions of the Civil Code. (*Enciclopedia Jurídica Española*, Vol. 9, p. 466.) But, as to the procedural requirements referring to venue, the meaning of "written agreement" is applicable only to a formal covenant made by the parties before commencing any judicial controversy, wherein it is previously agreed to grant jurisdiction to a particular court. An "agreement" may be express or implied. It may mean the meeting of the minds to create contractually rights and obligations but, when it is said that two persons agree *to* a thing, it might imply that both agree, although not between themselves, to a specific proposition, that is, that each one of them separately agrees, is in accordance with the same thing, without there being any bilateral agreement *between* the two. The Dictionary of the Royal Spanish Academy defines, in part, the word "*convenir*" (to agree) as "*coincidir dos o más voluntades causando obligación*," [6] but it also establishes another meaning, to wit, "*ser de un mismo parecer o dictamen.*" [7] The latter is, in our opinion, the true meaning of the concept as used in § 10, when providing that every case may be heard in the division where it is brought by agreement *of* the parties, (it does not say "agreement between the parties"),

---

[6] "to coincide two or more wills causing obligation."

[7] "to be of the same opinion or judgment."

that is, when each of the parties, separately, agrees, is in accord and finds it suitable, that the case should continue in that division, such agreement being manifested individually and separately, either expressly or implicitly, through his conduct or inaction in not objecting, having the opportunity to do so, to having the case continue in that division.

·Section 10, in its English text, upon referring to the agreement, uses the words "agreement of the parties." As stated in Webster's New World Dictionary, "agreement" means: "a contract... arrangement or understanding between two or more persons...*being in harmony and accord*. When both parties in a suit agree to a specific division, that may imply that both, separately, are in harmony and accord with the same purpose.

Judge Charles E. Clark, who played a distinguished role in the drafting of the bill which culminated in the Judiciary Act, identifies the term "agreement" with that of "consent," that is, that each one of the parties consents for the case to be heard in a specific division. 61 Yale L. J. 1147, 1157.

The legislative background in Puerto Rico supports our theory to the effect that when § 10 refers to the "agreement of the parties," it did not imply, exclusively, a written bilateral contract. Sections 75, 76 and 77 of our Code of Civil Procedure provide the following:

"Section 75.—Actions for the following causes must be tried in the district in which the subject of the action, or some part thereof, is situated, subject to the power of the court to change the place of trial, as provided in this Code:

"1. For the recovery of real property, or of an estate or interest therein, or for the determination in any form of such right or interest, and for injuries to real property.

"2. For the partition of real property.

"3. For the foreclosure of a mortgage on real property. Where the real property is situated partly in one district and partly in another, the plaintiff may select either of the districts, and the district so selected is the proper district for the trial of such action.

"Section 76.—In accordance with its jurisdiction, a court shall have cognizance of the suits to which the maintenance of all kinds of actions may give rise, when the parties may have agreed to submit the suit to decision of court.

"Section 77.—The submission shall be understood to be made:

"1. By the written agreement of the parties.

"2. By the plaintiff through the mere act of applying to the court and filing complaint.

"3. By the defendant when, after he appears of record, he takes any step other than to request that the trial be held in the proper court, or that the attachment decreed be suspended or lifted; *Provided,* That when a court dictates an order concerning the attachment of the property of a defendant residing in another district, the said defendant may cause said attachment to be suspended or lifted upon the payment, consignment, or guarantee of the amounts claimed, which he shall make to the marshal serving the attachment; *Provided, further,* That said marshal shall have power and authority to accept and approve the bond that is presented with two or more responsible bondsmen."

We may observe that under § 76 every court could take cognizance of any suit when the parties may have *agreed* to submit the suit to decision of the court. Section 77 defines the scope of the phrase "when the parties may have agreed" by indicating that such submission shall be understood to be made under specific circumstances. The "agreement" is identified with the "submission" and, under § 77 the submission was understood to be made, that is, the agreement in its general meaning, (a) by the written agreement of the parties; (b) by the plaintiff, upon filing the complaint; and (c) by the defendant after he appears of record and fails to request a transfer. From these Sections it appears that the written agreement of the parties was only a form of submission, that is, of the agreement of the parties to which § 76 refers in general. The reference made in that Section to the agreement of the parties was not limited to the first paragraph of § 77, that is, to the written agreement, but it

applied also to the other categories included in § 77, that is, to the implied submission.

Now then, the above-copied §§ 76 and 77 were adopted from the Spanish Code of Civil Procedure. In Spain as well as in Puerto Rico, it has been always understood that the "written agreement of the parties" mentioned in paragraph 1 of § 77, referred to a written agreement as to the place of trial, achieved before the commencement of the suit. *Gómez v. Toro*, 23 P.R.R. 596; *Banco de Ponce v. Iriarte*, 60 P.R.R. 72. And it has been repeatedly held also that where § 76 states that "when the parties may have agreed to submit the suit to decision" of a specific court, such agreement includes and is applicable to the implied submission of the parties, that is, to the implied agreement of the parties, as shown by their conduct or inaction in not requesting the transfer. *Enciclopedia Jurídica Española*, Vol. 29, p. 261; *Jiménez v. District Court*, 45 P.R.R. 891; *Carbonell v. Registrar of Property*, 17 P.R.R. 137; *Porto Rican Leaf Tobacco Co. v. Ereño*, 16 P.R.R. 96; *Arsuaga v. Registrar*, 46 P.R.R. 287.

We have already seen that it was, in part, the purpose of the judicial reform embodied in the Constitution and in the Judiciary Act, to eliminate jurisdictional defects, to destroy the inexorably fatal defects of a mistake as to the identity of the judicial forum or of the court where a case is to be heard, to expedite judicial matters, and to place the concept of jurisdiction in the category of the postulates referring to the place of trial or venue. It could not have been the legislative intent, in approving § 10 to limit the concepts of "agreement" and "submission" to only one of the categories of § 77, that is, to the written agreement. It could not have been its intention to eliminate the concept of "implied submission." A restrictive interpretation of the term "agreement of the parties" would be contrary to the essential purposes of the judicial reform.

Now then, it is to be noted that § 77 provides that the implied submission shall be understood to be made, as regards the plaintiff, upon the filing of his complaint, and as regards the defendant, after he appears of record without requesting a transfer. The problem arises whether, where a defendant fails to appear absolutely, that is, where he defaults, it means an implied submission, that is whether the concept of agreement is applicable to a party in default. In the case at bar, the persons summoned did not appear and did not raise any objection. The prosecuting attorney appeared and stated that he had no objection. At any rate, construing § 58 of the Spanish Code of Civil Procedure, counterpart to our § 77, the Supreme Court of Spain has decided that a defendant's default should not be deemed an implied submission. (Judgments of December 20, 1886 and of November 3, 1896.) The Spanish Court based its judgment on the theory that the latter Section requires the defendant to appear on record. From the point of view of juristic logic, the Spanish doctrine does not merit our approval. When dealing with an implied submission, due to defendant's inaction, that is, due to his failure to request the transfer when he had the opportunity to do so, such inaction being equivalent to a waiver of the privilege of requesting a transfer, the implied acceptance of a specific court or forum arises not only from his appearance and failure to request a change of venue, but also from being summoned, having knowledge that there is a case pending in court and, yet, not appearing at all and accepting silently the competency of the court. There is as much implied acceptance in one case as in the other. There is as much showing of conformity, of agreement or of consent in the case of appearing and not requesting a change of venue, as in not appearing at all. From a technical point of view, § 77 provides that the submission *shall be understood* to be made when the defendant appears of record and does not request the transfer. But to understand that certain forms are included in a general category does not exclude the pos-

sibility of the inclusion of other forms. The case of default is not excluded by § 77, especially when we view it in the light of an implied agreement. In any event, in view of the ample objective of § 10 of the Judiciary Act, to correct defects, the non-appearance of a party in a case brought in an inappropriate division, should not result in the dismissal of the action, and should be considered as the agreement or conformity of that party.

 Section 10 speaks of the agreement *of the parties*. It could be alleged that said provision is applicable to contested actions, where there are litigating parties. But it should be applied to contested actions and to those that might become contested. The dominion title proceeding as we have already seen, may become contested, especially if the record owners of contradictory titles in the Registry appear in court to enforce their rights. They have the opportunity to become parties and request the transfer, if they so desire. If they do not request it, they have agreed to allow the proceeding to continue in a specific division. In the case at bar, the prosecuting attorney, a former owner and the successors in interest of another former owner were summoned, and by edicts, all other persons whose rights might be impaired. All of them could have appeared but failed to do so, except the prosecuting attorney, who expressly stated that he had no objection.

In view of the foregoing, the dominion title order in the instant case, rendered by the Superior Court, Caguas Part, is not void and the Registrar of Property acted incorrectly in refusing to record the order.

The Registrar's note will be reversed and the registration of the dominion title order will be ordered.

Mr. Justice Negrón Fernández dissented.

MR. JUSTICE SIFRE, dissenting.

The majority opinion does not decide that the Judiciary Act repealed § 395 of the Mortgage Law which provides that the dominion title proceedings shall be submitted to "the judge of the court of first instance of the judicial district in which the property is situated." On the contrary, an effort is made to reconcile and harmonize it with the provisions of the Judiciary Act, stating that "there is a single 'judicial district' which includes the whole of Puerto Rico and if the property is situated in that single 'judicial district' ... any division of the Court of First Instance may take cognizance of a dominion title proceeding, in harmony with" the Mortgage Law. I cannot see how it is possible to reach that conclusion without regarding the afore-cited provision of § 395, *supra*, as repealed. Either it is repealed or it remains in force. If repealed, and that is my opinion, the interpretation given to it by the Court in order to make it consistent with the Judiciary Act, destroys its object and purpose, and is, in my opinion, erroneous.

It is my opinion that the provisions of § 10 of the Judiciary Act which deal, among other things, with the place where the civil or criminal actions may be filed and heard, do not apply by their very terms to dominion title proceedings. I am convinced that the Legislature did not intend to make them applicable. Such proceedings shall be brought subject to the provisions of § 395 of the Mortgage Act, and the competency of the judge to take cognizance thereof shall be determined by the district in which the property is situated without invoking the principle of submission acknowledged by § 10, *supra*, for other matters.

Although pursuant to the Judiciary Act there is a single judicial district, yet the Superior Court has parts in San Juan, Bayamón, Arecibo, Aguadilla, Mayagüez, Ponce, Guayama, Humacao and Caguas. The purpose pursued by § 395, *supra*, is attained and its provisions fulfilled by presenting the dominion title proceedings in the division of the

Superior Court of the district where the property is situated. This would not be inconsistent with the fact that there is a single judicial district.

The Registrar's note should be affirmed.

---

MR. JUSTICE BELAVAL, dissenting.

This appeal raises a more serious problem at bottom than it shows on its face. We have a case where for the first time we shall have to establish the effect of the judicial reform of 1952 on the historic structures of our Mortgage Law. The Registrar of the Property of Guayama refused to record a dominion title order, rendered by the Judge of the Superior Court, Caguas Part, on a rural property located at Quebradillas Ward of Barranquitas, on the ground that the property is located in a territorial district other than the one where the dominion title proceeding was brought. The respondent Registrar invokes § 395 of our Mortgage Law, which provides, that a dominion title proceeding shall be submitted *to the Judge of the court of first instance of the judicial district in which the property is situated.* The practical convenience behind § 395 is obvious: to give the opposing parties an opportunity to appeal to the nearest court and to object to petitioner's claim, in turn making more feasible the cardinal principle of publicity which inspires our Mortgage Law. Undoubtedly, if the dominion title proceeding is brought at the court nearest to the place where the rural property is located, the opposing parties at law have a better opportunity to enforce their rights, especially in the case of small land owners who generally lack means for their defense.

We agree, in principle, with the statement that the final provision in § 10 of Article III of Act No. 11 of July 24, 1952 (Spec. Sess. Laws, p. 30), known as the Judiciary Act of the Commonwealth of Puerto Rico which provides:

"Every case may be heard in the division or part where it is brought by agreement of the parties and consent of the judge

presiding at the time in such part or, if not so heard, shall be transferred by order of the judge to the appropriate division or part in accordance with such rules as may be adopted by the Supreme Court,"

seems to be in conflict with the initial provisions of § 395 of our Mortgage Law which provides:

"Any owner of property having no written title of ownership whatever be the period of the acquisition, may record such ownership upon proving it under the following formalities:

1.—He shall submit *to the judge of the court of first instance of the judicial district in which the property is situated,* or to the one of the district in which the larger portion thereof is situated, if the estate be located in more than one district, a statement of the manner in which he acquired it and any legal proof of such acquisition which he may have to offer, and praying that, *after citation of the person from whom the property may have been acquired,* or of his predecessor in interest, and of the representative of the department of public prosecution, such evidence be admitted and a declaration of his rights made."

To determine this unavoidable conflict, we feel constrained to review thoroughly the judicial reform which has taken place in Puerto Rico since 1950.

Until 1950, the court structure over which our Legislative Assembly had authority was as follows: (1) Court of justice of the peace, a sort of town commissary court, with original jurisdiction over violations of municipal ordinances and authorized to investigate misdeameanors, each court with a territorial limit fixed by law, within the perimeter of a city; (2) a municipal court, a court for ordinary litigations, entertaining originally personal actions up to $500 and criminal prosecutions of misdemeanors, and participating in the investigation of felonies, each with a territorial limit fixed by law within the perimeter of a municipality or more than one municipality, following the political organization corresponding to the Municipal Government and (3) a district court, a true court of first instance, in the classical sense of

the word which entertained originally personal actions in excess of $500 and felonies by information filed by a prosecuting attorney or in some misdemeanors, which were of great public importance, by information filed by a prosecuting attorney, in real actions, special legal proceedings, extraordinary remedies, family relations and review proceedings against some rulings of administrative agencies, each with a territorial demarcation fixed by law, within a perimeter of a district, following the political organization corresponding to the district for electoral purposes; (4) a court of last instance, with appellate jurisdiction over all the courts and over some administrative bodies of Puerto Rico, with power to hear in first instance certain extraordinary remedies, to hold examinations for admission to the bar and to discipline the attorneys admitted.

With such a simple structural plan, it is natural that the cases of conflict as to jurisdiction and competency should be few and devoid of any procedural complexity. For fifty years, attorneys of Spanish training, of North American training and of strictly Puerto Rican training collaborated in close harmony to reconcile the procedural legislation of a Spanish type—actions for survey, consignation, redemption, and perpetuam proceedings, possessory or dominion title proceedings, injunction to recover possession, testimonies under oath, cancellation of mortgage liens, mortgage foreclosure proceedings with the procedural legislation of a Puerto Rican type, derived at various times from North American sources. A detached analysis of the jurisprudence of the last twenty-five years shows that the vexatious problem which harassed other jurisdictions as to which court has jurisdiction or competency, was not a Puerto Rican problem.

In 1950, by virtue of Act No. 432 of May 15, 1950, (Sess. Laws, p. 1126), the different judicial seats established according to their respective territorial demarcations were unified for purposes of jurisdiction exclusively, although it was never clearly defined either in the law or in the jurisprudence

what was the scope of this unified·jurisdiction. The debates which ensued in the Constitutional Convention, allow us to conclude that the concept "jurisdiction" was somewhat equivalent to "territorial jurisdiction" and that we were·facing a problem of elimination of territorial seats exclusively. Sections 21 and 27 of Act No. 432 determined that any section of the Municipal or the District Court could take cognizance of any civil or criminal action included within their jurisdiction, (to be read competency), unless the transfer to the section that traditionally entertained such cases was requested.

The doctrine as to jurisdiction and competency was so clear and the tradition of limiting the territorial demarcation according to the political organization of the country was so strong, that this measure had no direct impact upon our judicial life. Our own files show that only two cases, both rather inoccuous, were submitted to this Court to determine the scope of the new Act. Actual practice, however, showed that the facility in filing a case outside the district or municipality where it was customarily heard, presented rather undesirable problems of operation: for example precautionary attachments became excessive, because the judges of the other districts or municipalities were not in a position to weigh fairly the value of the property attached as a resident judge would have been. At the time of taking provisional measures in extraordinary remedies, the judge of another district was unable to render as full a report as could have been rendered by the resident judge, in order to gauge the balance of conveniences. Where in contempt of temporary restraining orders a change of venue was sought for the contempt proceedings, the resident judge occasionally vacated the order to show cause and set aside the temporary restraining order because he had a different view of the case. Where the case was heard in a municipality or district outside the residence of the debtor, strictly for the attorneys' convenience, the expenses incidental to the hearing of the case

were too oppressive for litigants of meager resources, resulting in an advantage to litigants of greater means.

When our Constitutional Convention met in 1952 three main objections were in the air as to our judicial administration: (1) the delay in the disposition of judicial matters; (2) the desirability of separating the judicial function from any administrative control of the executive branch and (3) the desirability of drafting an administrative system which would guarantee judicial independence. The reform attempted by our Constitution will never be understood if we try to divorce it from the public debate that precedes it, with the idea of analyzing the purely theoretical postulates of said reform. If a democracy means above all the dissemination of conflicting ideas, the Constitutional Convention faced three problems strongly debated in public opinion; (1) the accumulation of pending cases, especially in those zones where the population had increased; (2) the lack of an adequate body operating within the very judicial field, to carry out a more systematic distribution of the judicial task and (3) the establishment of the maximum in judicial guarantees necessary to achieve actual judicial independence.

The solution of the problem of accumulation of pending cases in those zones where the population had increased had been previously attempted by creating new sections in the traditional courts and by the specialization of judges, who could dispose with greater ease of similar subjects submitted to their specialized skill. However, since 1950 it was considered that a single unified system in its purely functional aspect, would achieve a better result without the need of additional expenses such as the creation of new sections. In order to do this it was necessary to sacrifice the former system of permanence of the judges within their respective territorial districts, a principle which had been respected by Act No. 432 of May 15, 1950. To sacrifice the permanence of the judges within their respective districts is a risk which

goes to the very marrow of judicial independence. Such a power to transfer a judge from division to division, has always been one of the most conspicuous aspirations of attorneys, litigants and pressure groups. This mobility may create a judicature weak as a leaf which may shift with the whims of human passions. A mere insinuation of partiality, frequently present in suits of men, where passion holds no respect, even for the symbols of sociability, is sufficient to make a judge descend from his bench, by a mere administrative order, without the attorney having need to explain publicly the reasons for distrusting the impartiality of a magistrate. But the functional spirit so typical of our time, surmounted the traditional scruple against traveling courts "where the villain is always worsted by the hidalgo," as the classic would say whose name we can never remember too well. Such is the origin of § 2 of Article V of our Constitution.

It view of the absence of an adequate body, operating within the judicial field itself, to carry out a more systematic distribution of the judicial task, the Chief Justice of the Supreme Court of Puerto Rico was armed with plenary powers to supervise our entire judicial system. This is the origin of § 7 of Article V of our Constitution.

As to the maximum in judicial guarantees compatible with a democratic system, the Constitution saw to it that direct measures be provided, such as the prohibition of eliminating judges through the reorganization of the courts, the prohibition against shortening the terms of their appointments, the prohibition against decreasing the salaries of the judges during the term for which they were appointed. Each of these measures was the object of an exhaustive public debate, especially the first provision which serves as a key to the other two: the prohibition against eliminating judges through the reorganization of the courts. Such is the origin of §§ 8, 10 and 13 of Article V and § 11 of Article VI of our Constitution.

The Judicial Committee of the Constitutional Convention of Puerto Rico, upon reporting on the scope of what is known as the "integrated system," establishes the following as objectives of reform:

1—The greatest possible efficiency in the exercise of the Judicial Power;

2—An equitable distribution of the work of the courts which will permit prompt disposition of judicial proceedings and thereby avoid crowded court dockets;

3—Emphasis on the principle of specialization of judges rather than specialization of courts, thereby avoiding the necessity of additional courts or divisions and creation of an excessive number of judicial posts.

4—Reduction of the cost per case to the public treasury;

5—The greatest possible flexibility in the administration of justice.

In order to achieve these objectives the Committee recommends a measure that "establishes the *complete unification of the courts of Puerto Rico*. Unification of the courts among other things, results in *the elimination of technical problems* of jurisdiction. However, the legislative power may still *determine the venue of the courts* and may provide *that if a litigant files suit in a court other than that provided by the venue statutes, the opposing party may request and obtain removal of the cause, or the court on its own initiative may so direct*. The Legislative Assembly is also empowered to provide for judicial review of orders of removal."

As to the juridical scope of the integrated system, as something which we might consider different from the purely mechanical operation of the reform, the report of the Judicial Committee of the Constitutional Convention, states the following: "This integrated judicial system which we recommend will eliminate litigation of *the technical questions of jurisdiction*. Under the prevailing system in Puerto Rico the ends of justice have *frequently* been defeated and rights of litigants have been irremediably prejudiced because they

have sued in courts which under the said system lacked jurisdiction, *for highly technical reasons*, to decide such cases. *Frequently*, the technical error is discovered after a lapse of time and after the litigant has incurred expenses. The establishment of this unified judicial system which is recommended will completely eliminate all these deficiencies. *On the other hand, the power is reserved for the Legislative Branch to establish by law the venue of the courts, including the place where cases should be tried.* An error of venue will always be curable at the petition of the parties or by order of court without fatal prejudice to the rights of the litigants."

The frequency of technical error in jurisdictional problems, which seems to be one of the theoretical postulates of the reform, is so foreign to the practice of our profession in Puerto Rico that we can but smile whenever we see the issue in debate. Any Law Clerk of this Court could prove that the case that fails due to a technical problem of jurisdiction is so rare, so isolated, so unrelated to our body of doctrinal principles, that it never ought to have been a matter of deep concern for our reformers. It seems that the English experience with all its artificial nomenclature of courts grounded on statutory privileges, and the North American experience with all the conflicts inherent in its federative composition, were taken as a model of what might be the Puerto Rican case, and no attention was paid to our own reality. But it is always more desirable to avoid the purely personal elements of judgment in facing a reform and search with extreme objectiveness for the precise method.

Departing from the trend of thought which searches for an adequate operation for a better distribution of the judicial task, as well as from the trend of thought which seeks the elimination of the technical questions of jurisdiction, it is unquestionable that the concept of "jurisdiction" is understood as something different from "competency" and as something different from *"venue,"* that is, the concept jurisdiction

is taken in its generic sense, as the power conferred by law to each court.

We agree with the proposition universally maintained by the most trustworthy textwriters that the general theory on jurisdiction includes, not only the *jurisdiction* properly speaking, that is, the faculty expressly delegated by the sovereign to a specific tribunal by operation of law, to pass on the rights of the persons or things in any conflict that might ensue among the persons or referring to the things subject to the power of the sovereign, but also *jurisdiction over the subject matter*, that is, the competency to entertain certain litigious matters according to their relative value for society or for the economy, and the territorial jurisdiction, that is, the designation of the judicial area, (venue) where the delegated power to entertain certain matters should be exercised. But it is nonetheless true that the juridical terminology has been tracing in the course of time a dividing line between each specialty as if each had its own individual life within its class. So it is that the three key-concepts may also mean the following:

(1) jurisdiction, power to act over persons or things;

(2) competency, power to entertain certain matters excluding other judicial bodies created for other purposes; and

(3) venue, designation of the judicial area where an action may be brought in the name of the sovereign and certain subject matters may be entertained. This divisibility actually explains the opposed meanings which otherwise would be deduced from the very text of the report: that while on the one hand, the jurisdiction is unified for functional purposes, on the other hand it preserved the power of the Legislative Assembly of Puerto Rico to determine the competency and organization of our courts.

The central thesis of the report of the Judicial Committee of the Constitutional Convention is not altered in the Parliamentary debate which developed when it was being approved by the Convention in full. The President of the

Judiciary Committee, Mr. Ernesto Ramos Antonini, makes the most direct reference: "The independence of the judiciary is guaranteed, in our opinion, according to the proposition, by including in the project about 10 characteristics... integration, which has already been mentioned is one of them. At present, the system of the courts, as it is now, and especially concerning the Municipal Courts and to a certain extent, the District Courts, functions, to a considerable degree, as cells;. but rather than as cells, as separte and independent organs. *It is not a single organization.* We consider that under the present system the courts are liable to function in a more disintegrated manner from the central judicial power, which should give the tonic of the function of the judicial power in our society."

This ideal of a sole organization, of the greatest possible efficiency, of equitable distribution, of emphasis on the principle of specialization of judges, of diminishing the cost per case, of the greatest possible administrative flexibility according to the objectives set forth by the Judiciary Committee of the Convention is centered on a *unified system,* rather than on the total and complete elimination of the juridical problem of jurisdiction. At least we can affirm with some assurance that as regards the Constitutional Convention of Puerto Rico, *there was no intention of unifying the courts in all matters relating to their competency.* Therefore, the unified jurisdiction must be always understood in everything connected with the adoption of our Constitution, as something which does not include competency, that is, jurisdiction on the subject matter properly speaking. The text of our Constitution explains the following:

"The courts of Puerto Rico shall constitute a unified judicial system for purposes of jurisdiction, operation and administration. The Legislative Assembly may create and abolish courts, except for the Supreme Court, in a manner not inconsistent with this Constitution, and *shall determine the venue and organization of the courts."* (Section 2 of Article V of our Constitution.)

Since the Legislative Assembly of Puerto Rico preserves the power to determine the venue and organization of the courts of Puerto Rico, we must examine Act No. 11 of July 24, 1952, known as "The Judiciary Act of the Commonwealth of Puerto Rico," to see whether in making use of the authority granted to it by the Constitution, the Legislative Assembly of Puerto Rico proceeded to unify the venue and the organization of all the courts of Puerto Rico.

Since this is an Act drafted by a technical body to be submitted to a legislature and not one of those acts which are produced spontaneously within a legislature, undoubtedly it will be of little or no avail to inquire into what was the true legislative intent in this case. Perhaps the best method to study the Act is to see how far the theoretical plan proposed by the technical body is applicable to our judicial system, and submit any deficiency as a problem for our rule-making power.

The theoretical plan proposed by the technical body seems to assume that the unified jurisdiction means *an abolition of all the judicial categories* and that, therefore as regards the judges, any judge of the Superior Court may sit in a division of the District Court and viceversa, any judge of the District Court may seat in a division of the Superior Court, notwithstanding the difference in appointment, professional experience, term of duration and salary existing between one and the other. This may be gathered from §§ 3, 12 and 17 of the Act. The theoretical plan seems likewise to assume that the unified jurisdiction means *an abolition of all the judicial venues*, and that therefore, as regards subject matters, any division of the District Court may hear cases corresponding to the division of the Superior Court and vice versa, any division of the Superior Court may hear cases corresponding to the division of the District Court, notwithstanding the difference as to organization, competency and as to *different procedures on appeal* established in the very Act. This is what transpires from § 10 of the Act. Let us see.

Section 9 of Article III of the Judiciary Act of the Commonwealth of Puerto Rico which organizes the Court of First Instance provides:

"The Court of First Instance *shall consist of two divisions,* a division to be known as the Superior Court and a division to be known as the District Court. Each division shall be a court of record and shall be constituted as, and shall perform the functions, hereinafter set out."

Section 10, which defines what jurisdiction and what competency conferred by the former legislation is preserved by the Court of First Instance, provides:

"The Court of First Instance is a court of original general jurisdiction with power to act in the name and by the authority of the Commonwealth of Puerto Rico in all civil and criminal proceedings as hereinafter provided. *Every civil or criminal action shall be filed in the part of the court held at the place where it should have been filed under the legislation heretofore in force;* but no cause shall fail on the ground that it has been submitted to a division without jurisdiction or authority or to a part of the court of improper venue. Every case may be heard in the division or part where it is brought by agreement of the parties and consent of the judge presiding at the time in such part or, if not so heard, shall be transferred by order of the judge to the appropriate division or part *in accordance with such rules as may be adopted by the Supreme Court.*"

Section 13 which corresponds to Article IV, fixes the *Scope of Power* of the Superior Court as follows:

"The Superior Court shall have cognizance of the following matters:

(a) Civil:

1. Of all appeals and review proceedings against decisions, orders and rulings of administrative agencies under the terms and conditions established by law, except those cognizable by the Supreme Court.

2. Of all cases, actions, proceedings or extraordinary legal remedies in connection with or affecting the levy, collection and payment of all kinds of taxes, including property taxes, inheritance and gift taxes, income taxes, unfair profiteering taxes,

social insurance taxes, excises, license taxes and any other taxes or imposts, as well as of claims for taxes collected by unlawful procedure or which voluntarily or without notice from the Secretary of the Treasury were paid unduly or in excess, the reimbursement of which is authorized by law and is refused by the Secretary of the Treasury.

3. Of all disputes concerning the evaluation and proper compensation to be paid for property taken under the power of eminent domain.

4. Of all recourses, actions and proceedings, including the probation of wills, divorce and extraordinary and special legal remedies, in regard to which the District Court of Puerto Rico heretofore exercised cognizance up to the date on which this Act takes effect.

5. Of all other civil matters where the amount, legal interest or property sought exceeds in value the amount of two thousand five hundred (2,500) dollars, not including interest, costs and attorney's fees.

(b) Criminal:

1. Of all felonies.

2. Of all misdemeanors, except those involving the violation of statutes or municipal ordinances whose enforcement has heretofore been vested exclusively in the Municipal Court, or in the Justice of the Peace Court.

3. Of all causes previously cognizable by the Minors' Guardianship Court under the terms and conditions heretofore pertaining to such causes."

Section 18 of Article V, determines the *Scope of Power* of the District Court as follows:

"The District Court shall have cognizance of the following matters:

(a) Civil:

1. Of all matters of which the Municipal Court existing at the time this Act takes effect took cognizance, exclusively or concurrently.

2. Of all other civil matters where the amount, legal interest or property sought does not exceed in value twenty-five hundred (2,500) dollars not including interest, costs and attorney's fees, *except for those matters stated in Section 13 (a) 2, 3 and 4 herein of which cognizance is given to the Superior Court.*

(b) Criminal:

1. Of all misdemeanors, except those which were not heretofore cognizable by the Municipal Court.

2. Of all violations of statutes or of municipal ordinances whose enforcement has heretofore been vested exclusively or concurrently in the Municipal Court, or in the Justice of the Peace Court."

A thorough study of § 13 of Article IV and of § 18 of Article V, leads us to the inescapable conclusion that we have before us two courts completely different from each other, and that any theoretical attempt to unify both courts into a single one, as has been done in other places, would meet the inconvenience that the diverse organization of each court does not warrant the unity attempted. The diversity in competency rests fundamentally on the diversity in organization. The latter in turn rests on the diversity in procedure which is imposed by the different subject matters comprised within the competency. The new District Court would never as a general rule sit at a trial by jury, or entertain a real action which would need the intervention of a prosecuting attorney, nor would it have the probability in time and space for certain specialized matters. As a matter of fact § 13 (c) clearly establishes that when by operation of law, the review of decisions of administrative agencies or the institution of proceedings have been assigned to the former District Court of Puerto Rico, San Juan Section, said proceedings, henceforward shall be heard in the Superior Court of Puerto Rico, San Juan Section. It is significant that § 13 (c) is included under the subtitle of *"Place of trial of certain causes."*

A comparative study of § 14 of Article IV which provides:

"Final judgments, and other orders of the Superior Court from which heretofore an appeal might have been taken from the District Court, may be appealed to the Supreme Court under *the terms and conditions established by law and in accordance with* the rules of procedure established by the Supreme Court, *except* that the right and extent of appeal in cases brought under section 13 (a) 2, 3 and 4 of this Act shall be the same

as that heretofore and now accorded cases brought under section 13 (a) 5,"

and of § 19 of Article V which provides:

"The right of appeal from any final judgment of the District Court to the Superior Court is hereby established. *The procedure on appeal shall be in accordance with the rules established by the Supreme Court.* Hearing and decision of such appeals shall be by either three Superior Judges or a single Superior Judge, as the Supreme Court may by rule establish according to the nature of the case or the amount involved or other reasonable standard in its discretion; and the Chief Justice may assign the hearing of the cases under such rule if there is doubt or the parties do not agree. Further review thereafter shall be only by certiorari by the Supreme Court grantable by that Court in its discretion,"

shows that as regards the procedures on appeal, it is clearly impossible that a case included within the competency of one of the divisions be heard in the other, because the appellate system is designed in strict concordance with the distribution of competencies fixed by law, and as soon as a party would attempt to step out of this distribution of competencies, his right of appeal would be impaired.

Then, what is the meaning of the last provision of § 10 of Article III, which reads:

"Every case may be heard in the *division or part where it is brought* by agreement of the parties and consent of the judge presiding at the time in such part"...?

In the first place it is clear that the latter provision may not be construed entirely isolated from the other provisions of § 10, and still less, from the general plan of the reform. Section 10 begins (1) by granting to the Court of First Instance power to act in the name of the Commonwealth of Puerto Rico in all civil and criminal proceedings, *as hereinafter provided,* that is, the typical case of facultative jurisdiction; (2) by providing that every civil or criminal action shall be filed in the part of the court held at the place where

it should have been filed under the legislation theretofore in force, that is the typical case of territorial jurisdiction; (3) by providing that no civil or criminal action shall fail on the ground that it has been submitted to a division without jurisdiction or authority, or to a part of the court of improper venue, that is, an enhancement of the right of removal of a cause from one section to another, since formerly, not even under the reform of 1950, could a cause be removed from a former municipal court to a former district court and viceversa; and (4) it ends by providing that every case may be heard in the division or part where it is brought by agreement of the parties and consent of the judge presiding at the time in such part, or the judge may order its transfer to the appropriate division or part.

Which of these four provisions has the greater significance so as to stand as a keystone to the remaining three? Without any doubt provision No. 2 which orders that "every civil or criminal action shall be filed in the part of the court held, at the place where it should have been filed under the legislation heretofore in force" is the one having more force as a legislative order and less conflict with the present legislation. Undoubtedly if *every case* may be heard *in the division or part where* it is brought, the cardinal provision which states that it should be in the part of the court held at the place where it should have been filed under the legislation heretofore in force, is without merit.

We have already seen that the different organization of both courts or divisions constituting the Court of First Instance, as a matter of organization considered isolatedly, or as a matter of specialty of the subject matter concerned, taken isolatedly, does not allow this extreme flexibility presupposed by the phrase "every case may be heard in the division or part where it is brought," unless we are willing to sanction a complete judicial anarchy. As yet this Court has not undertaken to draft the rules on the removal of causes to submit them to the Legislative Assembly for their

final approval. Therefore, the solution in the alternative contained in the final provision of § 10 and which perhaps might duly clarify this situation, is not within the reach of our judiciary, which acting under the former legislation on the removal of causes, would not be entitled to order the removal from one section to another because our former procedural legislation did not warrant it.

This being the situation, we believe that following the underlying thought contained in provision No. 2 that no case shall fail on the ground that it has been submitted to a division *without jurisdiction*, or to a part of the court of improper venue, it should be construed, until a more uniform organization of all our courts is achieved, to mean that a case may only be heard by agreement of the parties, *when it has been filed in a division with competency* expressly conferred by the law in force, even though the division be other than that part of the court held at the place where the same should have been filed under the legislation heretofore in force, since the whole territory of Puerto Rico has been constituted into a single judicial district and the division by sections has lost all its efficacy insofar as territorial jurisdiction is concerned, although it has not lost efficacy as regards jurisdiction over the subject matter (competency).

Now then, § 10 itself of Act No. 11 of July 24, 1952 does not warrant, as a matter of law at the option of a single litigant, the filing of any civil action *at any division* of the proper section, but it provides that said action shall be filed, "in the part of the court held at the place where it should have been filed under the legislation heretofore in force," and it subordinates the exception that it may be heard in another division or part to an "agreement of the parties and consent of the judge presiding at the time in such part."

We cannot agree with the statement that the agreement of the parties may be expressed or implied, and that the nonappearance of a party is sufficient ground for any divi-

sion or part to continue entertaining a matter on which the very Act expressly denies competency. The last provision of § 10 does not contemplate a case of ordinary submission to a court with venue to take cognizance of certain matters. It contemplates a case of extraordinary submission to a court of improper venue to take cognizance of certain matters to a certain extent. Such submission displaces almost all the objectives of public policy intended by a statute of judicial organization. Assuming that the will of the litigants and the consent of the judge should be sufficient to alter the distribution of the judicial task ordered by the very statute, such submission must be written and express.

The determination by law of the venue is a real triumph of the people. In the history of procedure it marks a stepping stone towards justice due to the common peers. Perhaps its origin might be traced to the very moment when the community witnesses attested to certain facts of general knowledge in the community, which formed part of the "evidence." Perhaps the institution of the jury in civil actions, in the assumption of a superior knowledge of the custom the *fuero* might be found in the origin of the institution. The right to be tried within the place of one's own residence or near the place where one's properties are situated is not a senseless archaism, but the result of a struggle against the manipulations of the Curia Regis, against the centralization of the *Fuero Real*, in order to maintain justice within the reach of the traditional losing party.

It is true that in the case at bar, the Caguas Section as well as the Guayama Section of the Superior Court of the Court of First Instance had competency to entertain the dominion title proceeding. But according to the former legislation such proceeding should have been filed in that part of the Superior Court at the place where the property was situated. The last provision of § 10 has been applied under the theory that implied submission may be inferred where the action is filed in a different division, no opposing party

appears, and where the judge presiding at the time remains inactive. I cannot agree with this statement. The non-appearance of the opposing party in *ex-parte* proceedings or the defendant's default in ordinary civil actions, must not be construed as the case of formal submission contemplated by the last provision of § 10.

Incidentally, the case at bar has clear and definite implications regarding the desirability of not upsetting, more than absolutely necessary, the deep human worth of the judicial distribution. If we regard the last provision of § 10 as a possibility to exercise a sound judicial discretion, it can not be denied that a better basis for exercising the judicial discretion would always be to give the opposing party a better opportunity, at less cost, to oppose petitioner's right. I dissent.